UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRIYANKA IYENGAR PTY LTD.,

Plaintiff(s),

-against-

THEROPAY INC. and JEROME D'ORCHIMONT,

Defendant(s).

Civil Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, by and through her undersigned attorneys, complains of the defendants as follows:

**THE PARTIES**

1. Priyanka Iyengar PTY LTD., (hereinafter "Plaintiff") is and at all times relevant herein was a limited company existing under and by the virtue of the laws of the Commonwealth of Australia, with its principal place of business within the Commonwealth of Australia.

2. Defendant, THEROPAY INC., (hereinafter "TheroPay") is and at all times relevant was a corporation, organized under the laws of the State of Connecticut with its principal place of business located at 18 Wee Burn Lane, Darien CT 06820 and is a global payments infrastructure.

3. Defendant, Jerome d'Orchimont, is, and at all times relevant herein was, a resident of the State of Connecticut.

4. Defendant Jerome d'Orchimont is, and at all times relevant herein was, the chief growth officer and a co-founder of TheroPay and is liable for the debts and obligations of TheroPay.

## NATURE OF THE ACTION

5. This is a civil action brought to recover unpaid fees earned as a freelancer and to pierce the corporate veil of TheroPay and impose personal liability upon Defendants Jerome d'Orchimont for exercising his control and dominion over TheroPay to avoid obligations to Plaintiff, working a significant detriment to Plaintiff.

## JURISDICTION & VENUE

6. This Court has jurisdiction over the matter pursuant to section 11 of the Agreement, which states that any suit or proceeding arising out of or relating to the Agreement must be brought in the applicable federal or state court located in the State of New York, and should be construed in accordance with the laws of the State of New York.

7. The Court has jurisdiction over Defendant Jerome d'Orchimont pursuant to FRCP § 4(k)(1)(b), which permits parties to serve a summons to establish personal jurisdiction over a defendant who is a party joined under Rule 14 or 19 and is served within a judicial district of the United States and no more than 100 miles from where the summons was issued.

8. Defendant d'Orchimont is a necessary party under Rule 14 and is within the judicial district of the United States and not more than 100 miles from where the summons was issued, in the United States District Court in the Southern District of New York.

9. This Court has jurisdiction over Plaintiff and Defendant TheroPay through Diversity Jurisdiction. Plaintiff is domiciled in the Commonwealth of Australia, while Defendant TheroPay is headquartered in and has its principal place of business in the State of Connecticut in the United States of America.

## THE AGREEMENT

10. On or about April 15, 2025, Plaintiff entered into a Consulting Agreement (hereinafter "Agreement") with TheroPay to provide professional services to Defendant including, but not limited to, serving as TheroPay's Chief Legal Officer, overseeing regulatory and compliance matters, and reviewing and negotiating agreements. A true copy of the Agreement is attached as Exhibit 1.

11. The terms of the Agreement, in pertinent part, required TheroPay, to pay Plaintiff for the services of Priyanka Iyengar at an hourly rate of Seventy-Five Dollars ($75.00) an hour for work performed up to September 14, 2025. Invoices were to be paid by TheroPay within thirty (30) days of receipt of the invoice.

12. Beginning on September 15, 2025, TheroPay was to pay Plaintiff a flat monthly rate of Twelve Thousand and Five Hundred Dollars ($12,500.00), payable bi-monthly on the fifteenth and last day of the month.

13. In the event that TheroPay failed to timely pay the invoices, or flat monthly fee, "interested calculated on a daily basis on any unpaid amounts, at a monthly rate of 2%" (i.e. 24%) would be levied against TheroPay.

14. Pursuant to section 5(b) of the Agreement, either party may terminate the Agreement by providing "at least thirty (30) business days' written notice of termination."

15. Further, TheroPay agreed to pay Plaintiff an "additional amount" three times the monthly rate (i.e. $37,500) when the thirty days' notice of termination ends.

## STATEMENT OF FACTS

16. TheroPay has failed to pay Plaintiff's April 2025, June 2025, July 2025, and August 2025 invoices.

17. Further, whereas TheroPay was required to pay Plaintiff Twelve Thousand Five Hundred Dollars ($12,500.00 USD) per month, due bi-monthly, since September 15, 2025, TheroPay has failed to make the required payments to Plaintiff of $12,500 USD for November 2025, and has only paid Plaintiff $11,250 USD, between December 31, 2025 and February 28, 2026.

18. TheroPay has also not paid the March 2026 amount due, nor the amount of the monthly fee due up through April 17, 2026.

19. On March 10, 2026, TheroPay sent a termination notice to Plaintiff via email, based on Plaintiff's refusal to accept new projects because TheroPay had failed to pay her as was required under the Agreement.

20. Pursuant to section 5(b) of the Agreement, the Agreement terminated on April 17, 2026.

21. Whereas section 5(b) of the Agreement required TheroPay to pay Plaintiff an "additional amount" three times the monthly rate (i.e. $37,500) when the thirty business days' notice of termination ends (April 17, 2026), the termination fee was not paid, and remains outstanding.

**COUNT I: BREACH OF CONTRACT / ACCOUNT STATED**

22. Between April 15, 2025 and April 17, 2026, Plaintiff rendered services pursuant to the Agreement's terms.

23. Plaintiff submitted timely invoices for the services provided and Defendant accepted the invoices without objection.

24. As of April 30, 2026, Defendant has failed to pay the amounts due, which the Plaintiff earned under the aforesaid contract.

25. Demand for payment has been made and unjustifiably refused or neglected by Defendant.

26. The aforesaid actions and inaction by Defendants constitute a breach of the aforesaid contract, which caused financial loss to Plaintiff.

27. By and through the foregoing, defendant has failed to pay Plaintiff for the services rendered and Plaintiff has a cause of action for breach of contract and account stated.

28. By and through the foregoing, Plaintiff is entitled to contractual damages for services rendered, plus interest, penalties, costs and disbursements

**COUNT II: VIOLATIONS OF THE FREELANCE ISN'T FREE ACT UNDER NEW YORK GENERAL BUSINESS LAW § 1411-1414**

29. Plaintiff repeats and reiterates each and every one of the foregoing allegations as if more fully stated herein.

30. Plaintiff is, and at all times relevant herein was, a Freelance Worker as defined by New York State General Business Law § 1410.

31. Pursuant to G.B.L. Art. 44-A, § 1414, Plaintiff (Priyanka Iyengar PTY LTD.), with only one owner and employee, is considered a freelancer under New York Law. As such, it is entitled to double damages, attorneys' fees, and a civil penalty up to $25,000.

32. Defendant is, and at all times relevant herein was, a hiring party as defined by General Business Law § 1410.

33. By and through the foregoing failure to pay Plaintiff for the services rendered by the Plaintiff, the Defendants committed a violation of General Business Law § 1411.

34. Pursuant to General Business Law § 1414, Plaintiff is entitled to statutory damages, plus double damages, plus an award of attorney's fees.

**COUNT III: PIERCING THE CORPORATE VEIL UNDER NEW YORK LAW**

35. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

36. Defendant Jerome d'Orchimont, in his position as an officer/director, co-owner, and co-founder of TheroPay, had complete discretionary control over TheroPay.

37. Defendant d'Orchimont exercised his complete control and dominion over TheroPay to frustrate Plaintiff's ability to recover any outstanding payments owed by TheroPay to Plaintiff pursuant to the Agreement.

38. Defendant d'Orchimont abused his complete dominion and control over TheroPay to ensure that it could continue operating while avoiding TheroPay's obligation to Plaintiff under the Agreement.

39. Defendant d'Orchimont operated TheroPay in such a manner that warrants the piercing of the corporate veil among Defendants, resulting in joint and several liability to Defendant for amounts owed for the period since April 2025, plus interest, the payment penalty, and Plaintiff's attorneys fees and costs.

40. Upon information and belief, d'Orchimont used his dominion and control over TheroPay to withhold payment owed to Plaintiff under the Consulting agreement in bad faith in order to invoke the "for cause" termination in an attempt to evade TheroPay's payment obligations.

41. Upon information and belief, d'Orchimont dominated TheroPay to such an extent that the Corporation had no will of its own with respect to honoring Plaintiff's invoices and payments in accordance with the payment schedule and directed withholding of payments

otherwise due under the Agreement in order to pressure Plaintiff to work without pay or to avoid TheroPay's contractual obligations.

42. Upon information and belief, Defendant d'Orchimont misused the corporate form and treated it as an alter ego by entering into an agreement with Plaintiff to promise compensation of a specific rate pursuant to the Agreement in exchange for Plaintiff's services, when he knew or had reason to know that TheroPay would not fulfill on those payments, commingle corporate and personal funds and/or assets, failure to adhere to corporate formalities, siphoning of corporate funds by d'Orchimont, use of corporate funds for personal purposes, and use of the corporation as a façade for his own personal dealings.

43. Upon information and belief, Defendant d'Orchimont used his complete dominion over TheroPay to evade contractual obligations to Plaintiff and frustrate the purpose of the Agreement, thereby causing injury to Plaintiff in the form of unpaid compensation for almost one full year of services, contractual interest, and related damages.

44. Upon information and belief, Defendant d'Orchimont used his complete dominion over TheroPay to establish a pattern and practice of hiring foreigners on the pretense of lucrative contracts and promises with the intent to defraud them after services are rendered.

45. Allowing TheroPay to maintain its separate corporate existence under these circumstances would promote injustice by allowing Defendant d'Orchimont to hide behind the "corporate veil" and avoid making Plaintiff whole.

46. A plaintiff may pierce the corporate veil where the owner exercised complete domination of the corporation in respect to the transaction attacked and such domination was used to commit a fraud or wrong that resulted in plaintiff's injury.

47. Based on the foregoing, the corporate veil of TheroPay should be pierced, and Defendant d'Orchimont should be held jointly and severally liable as an alter ego of TheroPay for the damages caused to Plaintiff pursuant to the Agreement.

WHEREFORE, Plaintiff demands judgment against the Defendants for

(i) Compensatory damages equal to the total unpaid compensation pursuant to the Agreement.

(ii) Contractual interest at 2% per month from each due date until payment made in full,

(iii) Additional compensation equivalent to three (3) times the Monthly Rate from the date when the thirty-day notice of termination ends for termination without cause, pursuant to section 5(c) of the Consulting Agreement,

(iv) Penalties, attorney fees and double damages under the New York State Freelance Isn't Free Act, under General Business Law §§ 1411-1414;

(v) Such other relief as deemed just.

Dated: White Plains, NY
June 5, 2026

Yours etc.,

LAW OFFICE OF MICHAEL H. JOSEPH, P.L.L.C.

BY: *John V. Tait* (JT 4835)
John V. Tait, Esq.
203 East Post Road
White Plains, New York 10601
(914) 574-8330
john@newyorktriallawyers.org

EXHIBIT 1

TheroPay
Compliance Meets Intelligence

**CONSULTING AGREEMENT**

This Consulting Agreement ("**Agreement**") is made and entered into as of April 15, 2025 (the "**Effective Date**") by and between Priyanka Iyengar PTY LTD. ("**Consultant**") and TheroPay, Inc. (the "**Company**"). Company and Consultant may be referred to individually as "Party" and collectively as "Parties." Each Party represents and warrants that the person signing this Agreement has been duly authorized to execute on its behalf. In consideration of the mutual promises and covenants set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Services. Consultant will provide Priyanka Edema also known as Priyanka Iyengar (the "**Principal**"), as an independent contractor to Company to perform those services set forth on Exhibit A attached hereto (the "**Services**"). The Consultant is responsible for the obligations which the Principal undertakes under this Agreement, including performing the restrictive stipulations imposed on the Principal.

2. Payments.

(a) Compensation. In consideration of the Services to be rendered hereunder, the Company shall compensate Principal as set forth on Exhibit A attached hereto. For a period starting from the Effective Date and ending on September 14, 2025, Principal shall submit monthly invoices (which shall specify in bare minimum detail, the Services performed, and the time spent performing the Services) to the Company for the Services rendered hereunder. Starting from September 15, 2025, Consultant shall cease to provide invoices as the compensation structure would change to a flat rate as detailed in Exhibit A. Payment with respect to an invoice shall be due thirty (30) days from the Company's receipt of an invoice and payments with respect to the flat rate shall be due every fifteen (15) days. If Company does not pay any invoice or the flat rate amount on or before the due dates, an interest calculated on a daily basis on any unpaid amounts, at a monthly rate of 2% (two percent), or the maximum amount chargeable by law, whichever amount is higher, shall be levied. The Company expressly agrees and warrants that all late payments shall be paid by Company to the Principal after adding the two percent interest as stated above.

(b) Expenses. In the event the Company requests the Consultant or Principal to travel or purchase an item on the Company's behalf, Company shall reimburse Consultant for all expenses that are incurred in connection with the performance of such additional Services or for travel hereunder. Consultant shall be eligible for additional daily allowances excluding any food and hotel allowances for any requested travel (including any travel related to purchasing an item) as per the Company's travel policy.

(c) Taxes. Consultant and, as the case may be, the Principal, acknowledges and agrees that it shall be their obligation to report as income all compensation received by Consultant pursuant to this Agreement and to pay any withholding taxes, self-employment taxes, wages, superannuation, and social security, unemployment or disability insurance or similar items, including interest and penalties thereon, in connection with any payments made to Consultant by the Company hereunder. Consultant agrees to report such compensation and make such payments to the relevant tax authorities.

3. Proprietary Information.

(a) Consultant and Principal understand that its work for the Company will involve access to and creation of confidential, proprietary and trade secret information and materials of the Company (and its affiliates, licensors, suppliers, vendors and customers) (collectively, "Proprietary Information"). Proprietary Information includes, without limitation, any (a) information, ideas or materials of a technical or creative nature, such as research and development results, designs and specifications, computer source and object code, patent applications, and other materials and concepts relating to the Company's products, services, processes, technology or other intellectual property rights; (b) information, ideas or materials of a business nature, such as non-public financial information; information regarding profits, costs, marketing, purchasing, sales, customers, suppliers, contract terms, employees and salaries; product development plans; business and financial plans and forecasts; and marketing and sales plans and forecasts; (c) all personal property or information, including, without limitation, all books, manuals, records, reports, notes, contracts, lists, blueprints and other documents or materials, or copies thereof, provided to or received by Consultant or, as the case may be, Principal under this Agreement or in the course of Consultant's or Principal's rendering of Services to the Company, including, without limitation, records and any other materials pertaining to Creations (as defined below) and any tangible materials (document, reports, etc.) that Consultant or Principal prepares in connection with Services; and (d) the terms and conditions of this Agreement.

(b) Consultant and Principal understand that Proprietary Information is extremely valuable to the Company and its affiliates, licensors, suppliers, vendors and customers. Accordingly, Consultant and Principal agree during the term of this Agreement and thereafter that it (a) shall hold all Proprietary Information in strict confidence and trust for the benefit of the Company; (b) shall not copy or use (or allow any of its employees, contractors or agents to copy or use) any Proprietary

Information, except as may be necessary to perform the Services; (c) shall use the Proprietary Information only for the benefit of the Company (and not for the benefit of Consultant or any third party); and (d) shall not disclose or otherwise make available any such Proprietary Information to any third party except as authorized in writing and in advance by the Company. All Proprietary Information is and shall remain the sole property of the Company. Consultant shall be responsible and liable for the acts and omissions of its employees, contractors and agents.

(c) The foregoing restrictions on use and disclosure shall not apply to any Proprietary Information to the extent Consultant or, as the case may be, the Principal, can prove such Proprietary Information (a) is or has become generally known to the public through no unlawful act or omission of Consultant or, as the case may be, the Principal, or breach of this Agreement; (b) was known to Consultant or, as the case may be, the Principal, at the time of its disclosure by the Company, as evidenced by Consultant's written records; (c) was independently developed by Consultant or, as the case may be, the Principal, without any use of the Proprietary Information, as evidenced by Consultant's written records; (d) becomes known to Consultant or, as the case may be, the Principal, from a source other than the Company without breach of this Agreement and otherwise not in violation of the Company's rights, as evidenced by Consultant's written records; (e) such disclosure is approved in advance and in writing by the Company; or (f) Consultant or, as the case may be, the Principal, is legally compelled to disclose such Proprietary Information, provided that Consultant or, as the case may be, the Principal, shall give advance written notice of such compelled disclosure to the Company, and shall fully cooperate with the Company in connection with any efforts to prevent or limit the scope of such disclosure and/or use of the Proprietary Information.

(d) Consultant or, as the case may be, the Principal shall not breach any agreements to keep in confidence and refrain from using the confidential, proprietary or trade secret information of another client or employer. Consultant or, as the case may be, the Principal, shall not provide to the Company with any information about another client or employer, in the Creations or otherwise, nor shall Consultant use any such information in its activities for the Company, without the prior written consent of the Company and such other client or employer.

4. Creations.

(a) As used in this Agreement, "Creations" shall include, without limitation, all designs, copyrightable works, ideas, inventions, discoveries, innovations, technology and other creations (including, without limitation, software, design or performance specifications, reports and other documentation), and any related work-in-progress, improvements or modifications to the foregoing, that are created, developed or conceived (alone or with others) in connection with the Services hereunder or Consultant's or, as the case may be, the Principal's, activities for the Company, whether or not patentable, (a) during the term of this Agreement, whether or not created, developed or conceived during regular business hours, and (b) if based on Proprietary Information, after termination of this Agreement. Creations shall include, without limitation, all materials delivered to the Company in connection with this Agreement.

(b) All Creations shall be the sole property of the Company, with the Company having the right to obtain and hold in its own name all intellectual property rights in and to such Creations. Consultant and Principal hereby irrevocably assigns and agrees to assign to the Company, without additional consideration, all right, title and interest in and to all Creations, whether currently existing or created or developed later, including, without limitation, all copyrights, trademarks, trade secrets, patents, industrial rights and all other intellectual property and proprietary rights related thereto, whether existing now or in the future, effective immediately upon the inception, conception, creation or development thereof. Consultant and Principal shall (a) disclose promptly in writing to the Company all Creations and (b) whether during or after the period of its consulting arrangement with the Company, execute such written instruments and do such other acts as may be necessary in the opinion of the Company to obtain a patent, register a copyright or otherwise evidence or enforce the Company's rights in and to such Creations (and Consultant and Principal hereby irrevocably appoints the Company and any of its officers as its attorney in fact to undertake such acts in its name).

(c) To the extent, if any, that Consultant or, as the case may be, the Principal, retains any right, title or interest in or to any Creations, Consultant or, as the case may be, the Principal, hereby grants to the Company a perpetual, irrevocable, fully paid-up, transferable, sublicensable, exclusive, worldwide right and license (a) to use, reproduce, distribute, display and perform (whether publicly or otherwise), prepare derivative works of and otherwise modify, make, sell, offer to sell, import and otherwise use and exploit (and have others exercise such rights on behalf of the Company) all or any portion of such Creations, in any form or media (now known or later developed); (b) to modify all or any portion of such Creations, including, without limitation, the making of additions to or deletions from such Creations, regardless of the medium (now or hereafter known) into which such Creations may be modified and regardless of the effect of such modifications on the integrity of such Creations; and (c) to identify Consultant, or not to identify Consultant, as one or more authors of or contributors to such Creations or any portion thereof, whether or not such Creations or any portion thereof have been modified. Consultant and Principal further waives any "moral" rights or other rights with respect to attribution of authorship or integrity of such Creations Consultant

or, as the case may be, the Principal, may have under any applicable law, whether under copyright, trademark, unfair competition, defamation, right of privacy, contract, tort or other legal theory.

5. Term and Termination.

(a) This Agreement shall commence on the Effective Date and remain in full force and effect until terminated in accordance with the terms hereof.

(b) Either Party may terminate this Agreement at any time for any reason by providing at least thirty (30) business days' written notice of termination to the other Party.

(c) Upon the termination or expiration of this Agreement, Consultant shall immediately cease performing the Services. If this Agreement is terminated by Company without cause, Company agrees to pay Consultant the compensation due for the period up to the date of termination with interest as detailed in Section 2(a), and an additional amount equivalent to three times the Monthly Rate (as defined in Exhibit A), from the date when the thirty days' notice of termination ends.

(d) Upon the termination or expiration of this Agreement, and upon Company fulfilling its obligations detailed in Section 5(c), Consultant shall deliver immediately to the Company all property belonging to the Company, including Proprietary Information and any copies thereof, whether prepared by Consultant or others. Following the termination or expiration of this Agreement, Consultant shall not retain any written or other tangible material containing any Proprietary Information, except for legal and auditing purposes.

6. Assignment. The Agreement shall be binding on the Parties and their respective Affiliates, successors, and assigns. Either Party may assign the Agreement upon written notice, without the other Party's prior written consent: (a) in connection with the sale of all or substantially all of its assets; (b) to the surviving entity in any merger or consolidation; or (c) to an Affiliate. Any other assignment will require the prior written consent of the other Party.

7. Notices. Any notice or other communication provided for in this Agreement shall be sent by personal delivery, certified mail or Federal Express, or e-mail to the address set forth on the signature page hereof. For written notification sent via e-mail, receipt shall be the date and time the recipient's server time stamps the e-mail. Either Party may change its address for purposes of this paragraph by providing written notice in the manner provided above.

8. Severability of Provisions. If any section, provision, or part of this Agreement is held to be illegal, invalid or unenforceable, such section, provision, or part shall be fully severable. The remainder of this Agreement shall remain in full force and effect.

9. Waiver. The waiver by either Party of a breach of or a default under any provision of this Agreement shall not be effective unless in writing and shall not be construed as a waiver of any subsequent breach of or default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of either Party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a waiver of any such right or remedy.

10. Force Majeure. Consultant shall not be liable for any failure in performance due to causes beyond its reasonable control (such as fire, explosion, power blackout, earthquake, flood, severe storms, strike, embargo, labor disputes, acts of civil or military authority, war, terrorism (including cyber terrorism), acts of God, acts or omissions of Internet traffic carriers, actions or omissions of regulatory or governmental bodies (including the passage of laws or regulations or other acts of government that impact the delivery of Services).

11. Governing Law; Venue. This Agreement is governed by and shall be construed in accordance with the laws of the state of New York (except that body of law controlling conflict of laws) and the United Nations Convention on the International Sale of Goods will not apply. Any suit or proceeding arising out of or relating to the Agreement will be brought in the applicable federal or state court located in the state of New York.

12. Remedies cumulative. Except with respect to rights and remedies expressly declared to be exclusive in the Agreement, the rights and remedies of the Parties are cumulative hereunder and are in addition to and not a substitute for all other remedies contained in the Agreement or as otherwise available at law or in equity.

TheroPay
Compliance Meets Intelligence

13. Relationship of Parties. This Agreement shall not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise, between the Parties; and the Parties shall at all times be and remain independent contractors. Neither Party shall have any obligation or duty to the other Party except as expressly and specifically set forth herein, and no such obligation or duty shall be implied by or inferred from this Agreement or the conduct of the Parties hereunder. Consultant shall be solely responsible for all tax returns and payments required to be filed with or made to any federal, state or local tax authority with respect to Consultant's performance of Services and receipt of fees under this Agreement. Notwithstanding anything contained in this Agreement, Consultant shall have complete and unrestricted freedom, during and after the term of this Agreement, to solicit, contract with, and perform services for any clients, customers, vendors, or employees, including those of the Company. The Consultant may also engage in any other business, trade, or profession, whether or not competitive with the Company. The Company expressly waives any duty of exclusivity, loyalty, or non-solicitation, and acknowledges that the Consultant is free to pursue all independent or competing commercial activities at any point in time.

14. Modification or Amendment. No amendment, change, or modification of this Agreement shall be valid unless made in writing and duly executed by the Company, Consultant, and Principal.

15. Headings. The headings used in this Agreement are for convenience only and shall not be considered in construing or interpreting this Agreement.

16. Counterparts. This Agreement and any amendments hereto may be executed in one or more counterparts. All of such counterparts shall constitute one and the same Agreement and shall become effective when a copy signed by each Party has been delivered to the other Party. The Parties agree that electronic signatures shall be as effective as if originals.

17. Entire Agreement. This Agreement supersedes and replaces any prior understandings or agreements, whether oral, written, or implied, between the Parties regarding the matters described in this Agreement. This Agreement contains all of the terms, covenants, conditions, warranties and agreements of the Parties, shall be considered to be the only agreement between the Parties hereto.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates indicated below, to be effective as of April 15, 2025.

| THEROPAY, INC. | | PRIYANKA IYENGAR PTY LTD. | |
|---|---|---|---|
| **By** | [signature] | **By** | [signature] Priyanka Edema (Oct 31, 2025 02:40:55 GMT+11) |
| **Name** | Jerome d'Orchimont | **Name** | Priyanka Edema |
| **Title** | Director, Co-founder & President | **Date** | October 30, 2025 |
| **Notice email** | legal@theropay.io | **Notice email** | Priyanka.edema@gmail.com |
| **Address** | 19 Old Kings Hwy S Suite 200, Darien CT 06820 United States | **Address** | [redacted] VIC 3214 Australia |

TheroPay
Compliance Meets Intelligence

**EXHIBIT A**

**Schedule of Services**

**Services:** Consultant shall represent the Principal as TheroPay's Chief Legal Officer and shall perform such services as requested from time to time including but not limited to:

- Advise executive leadership on corporate legal matters.
- Draft, review, and negotiate commercial agreements, including customer contracts, vendor agreements, partnership deals, and NDAs.
- Oversee corporate governance, including board resolutions, bylaws, and maintenance of company records.
- Coordinate with outside counsel as needed.
- Ensure compliance with federal, state, and international laws applicable to payment processing (e.g., FinCEN, CFPB, NACHA, GDPR, CCPA).
- Review policies and procedures aligned with regulatory expectations (e.g., AML, KYC, OFAC).
- Identify legal and operational risks and develop risk mitigation strategies.
- Monitor and report on regulatory developments and advise the executive team on implications.
- Establish internal policies for handling fraud, chargebacks, consumer protection, and data privacy.
- Support fundraising efforts, including SAFE notes, convertible debt, and equity financings.
- Advise on M&A activity, strategic partnerships, and joint ventures.
- Assist with due diligence and investor legal reviews.

**Compensation:** For a period starting from the Effective date and ending on September 14, 2025, Company shall compensate Consultant at an hourly/ annual rate of $75 (Seventy-Five USD) payable in accordance with Section 2 of the Agreement.

Starting from September 15, 2025, Consultant shall be paid a flat monthly rate of $12,500 (Twelve thousand and five hundred USD) payable by TheroPay bi-monthly on the fifteenth and the thirtieth/ thirty first of every month ("Monthly Rate"). Consultant shall perform duties and tasks equivalent to a minimum of 8 working hours per day, for the total number of working days in a month, amounting to a full-time work schedule.

# TheroPay_Contractor Agreement (Principal)_PriE

Final Audit Report 2025-10-30

| | |
|---|---|
| Created: | 2025-10-30 |
| By: | Jerome d'Orchimont (jmdorchimont@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASs9zjgc7_C5DhZZFC1MLByOePUmqCqop |

## "TheroPay_Contractor Agreement (Principal)_PriE" History

Document created by Jerome d'Orchimont (jmdorchimont@gmail.com)
2025-10-30 - 3:38:21 PM GMT

Document emailed to Priyanka Edema (priyanka.edema@gmail.com) for signature
2025-10-30 - 3:38:29 PM GMT

Document emailed to Jerome d'Orchimont (jmdorchimont@gmail.com) for signature
2025-10-30 - 3:38:29 PM GMT

Email viewed by Priyanka Edema (priyanka.edema@gmail.com)
2025-10-30 - 3:40:20 PM GMT

Document e-signed by Priyanka Edema (priyanka.edema@gmail.com)
Signature Date: 2025-10-30 - 3:40:55 PM GMT - Time Source: server

Document e-signed by Jerome d'Orchimont (jmdorchimont@gmail.com)
Signature Date: 2025-10-30 - 3:47:17 PM GMT - Time Source: server

Agreement completed.
2025-10-30 - 3:47:17 PM GMT